**RAYMOND PROFFITT FOUNDA-TION, Lehigh River Stocking Assn., Plaintiffs,**

v.

**U.S. ARMY CORPS OF ENGINEERS, Lt. Col. Debra M. Lewis, Defendants.**

No. 99–CV–4038.

United States District Court, E.D. Pennsylvania.

Nov. 20, 2001.

John W. Wilmer, Media, PA, for plaintiffs.

Richard A. Monikowski, U.S. Dept. of Jusitce, Environment and Natural Resources, Washington, DC, Kent E. Hanson, Silvia Sepulveda-Hambor, Environmental Defense Service, U.S. Dept. of Justice, Washington, DC, K.T. Tom Linson, U.S. Attorney's Office, Assist. U.S. Atty., Philadelphia, PA, for defendants.

*MEMORANDUM AND ORDER*

ANITA B. BRODY, District Judge.

Plaintiffs' complaint alleges violations of numerous statutory provisions, including: (1) Section 306 of the Water Resources Development Act of 1990 ("1990 WRDA"); (2) Section 6 of the Water Resources Development Act of 1988 ("1988 WRDA"); (3) the Fish and Wildlife Coordination Act ("FWCA"), 16 U.S.C. § 661 *et seq.* (2000); (4) the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.* (1994 & Supp.2001); and (5) the Pennsylvania Constitution, Art. 1, § 27. On August 23, 2000, I granted defendants' motion to dismiss as to several other claims.[1] Before me now are parties' cross motions for summary judgment. Each party has moved for summary judgment on all remaining claims in the case.

## I. Background

The Philadelphia District of the U.S. Army Corps of Engineers is responsible for the operation of the Walter Dam, which is a part of the Lehigh River Basin Flood Control Project. *See* Walter Dam Manual ("WD Manual"), Administrative Record ("AR") IX, 001.[2] The Walter Dam is located on the Lehigh River in Carbon, Luzerne and Monroe Counties in Northeastern Pennsylvania. The dam was completed in 1961. Construction of the Walter Dam was originally authorized for the primary purpose of flood control by Section 10 of the Flood Control Act of 1946. *See* Flood Control Act of 1946, ch. 596, § 10, 60 Stat. 641, 643. Years later, in the Water Resources Development Act of 1988, Congress designated the Walter Dam as a water resources project to be "operated in such a manner as will protect and enhance recreation." Pub.L. 100-676, 102 Stat. 4012. Two years after that, Congress passed the Water Resources Development Act of 1990, in which Congress included "environmental protection as one

1. Plaintiffs also brought several other claims in their original complaint which have since been dismissed or withdrawn by plaintiffs. In an Memorandum and Order dated August 23, 2000, I granted defendants' Partial Motion to Dismiss with regard to three additional claims under the 1990 WRDA. *See Raymond Proffitt Foundation, et al., v. U.S. Army Corps of Engineers, et al.,* 128 F.Supp.2d 762 (E.D.Pa.2000). Additionally, in Plaintiffs' Answer to Defendants' Motion to Dismiss and for Summary Judgment, filed on March 21, 2001, plaintiffs withdrew two claims asserted under the Pennsylvania Water Quality Standards Act and the Clean Water Act.

2. All citations to the administrative record will include the tab number and the page number of the cited text.

of the primary missions of the Corps ... in ... operating and maintaining water resources projects." 33 U.S.C. § 2316 (West Supp.2001).

Plaintiffs contend that the way the Corps releases water from the Walter Dam into the Lehigh River does not protect the environment. According to plaintiffs, the Corps is releasing too little water during the summer, a period of low precipitation, and too much water during the winter and spring, periods of high precipitation. This is caused by the Corps' decision to maintain the conservation pool at the Walter Dam at a set elevation of 1300 feet. Plaintiffs allege that this storage level is arbitrary and has severe negative consequences for the environment. They claim that the low summertime flow permitted under the Corps' "minimum release level" (the minimum amount of water released from the dam) has a negative impact on aquatic life as fish cannot survive during low flow periods. Plaintiffs note that several studies show that increased minimum release flows during the summer months would protect downstream fish and wildlife. Increasing minimum release levels would allegedly improve the water quality of the Lehigh River by diluting acid mine drainage and downstream sewage concentration. Plaintiffs also claim that the Corps' concern for the elevation of the conservation pool contributes to high volume water releases from the dam in the winter and spring. These large releases allegedly injure wildlife by destroying the eggs of aquatic animals and killing birds nesting downstream along the banks of the Lehigh River. Studies have also found that rapid flow fluctuation harms the diversity and density of river-dwelling fish.

According to plaintiffs, the U.S. Fish & Wildlife Service actually told the Corps that the Corps' current minimum release policy causes harm to the Lehigh River. That agency, as well as its state counterpart, the Pennsylvania Fish and Boat Commission, and environmental groups, including plaintiffs, have allegedly asked the Corps to provide a steady flow of water to the Lehigh River throughout the year to remedy some of their environmental concerns. Plaintiffs suggest that this be done by storing water in the winter and spring and then releasing the stored water during the summer. They claim that the Corps told them that it would only increase the water flow from the dam during summer months if a non-federal sponsor paid the Corps to store water during the winter and spring.

Plaintiffs contend that the Corps has agreed, in the past, to control release flows from the dam for the Delaware River Basin Commission ("DRBC") by storing water in the dam's reservoir. The DRBC is a commission formed of both state and federal representatives that is responsible for water use and conservation in the Delaware River Basin.[3] On several occasions during the past forty years, the DRBC has entered into contracts with the Corps for the storage of extra water in the Walter Dam's conservation pool. While compensation was not a part of the earliest contracts, the DRBC paid the Corps for water storage under several of the later agreements. Water storage for the DRBC typically increases the elevation of the pool to 1392 feet and has lasted for periods between two and eighteen months. The most recent case of water storage for the DRBC occurred during the summer of

3. The Delaware River Basin contains 13,539 square miles, draining parts of Pennsylvania (6,422 square miles or 50.3 percent of the basin's total land area); New Jersey (2,969 square miles, or 23.3%); New York (2,362 square miles, 18.5%); and Delaware (1,002 square miles, 7.9%). *See* DRBC website *at* http://www.state.nj.us/drbc/thedrb.htm (last visited November 13, 2001).

1999. In addition, plaintiffs allege that the Corps is currently in negotiations with the DRBC for similar storage in the future. Plaintiffs claim that if the Corps agreed to store water in the reservoir for environmental releases at the same elevation at which it has stored water for the DRBC, such storage would permit an increase in daily flows during the summer months. They point out that during a twenty-four hour period in July 1999, the water flow from the dam was 65 cubic feet per second ("cfs"). Storage at the level at which the Corps has agreed to store water for the DRBC would increase the minimum flow to 200 cfs for a three month period. According to plaintiffs, such a flow would protect the environment of the Lehigh River.

Plaintiffs also assert that the Corps is taking insufficient action to carry out its statutory mandate to provide recreation at the Walter Dam. The Corps has established a schedule of high-level water releases several times a year for white water rafting, as well as providing picnic areas and boat launches for public use. The plaintiffs claim that these are inadequate provisions to satisfy the recreational purpose of the Walter Dam. They also claim that the minimal water releases during summer months do not protect or enhance recreation, as low water flow in the Lehigh River adversely affects recreation on the river. Low flows during the summer prevent members of plaintiffs' organizations from fishing, boating and white-water rafting on the section of the Lehigh River downstream from the Dam. One of the plaintiffs, the Lehigh River Stocking Association ("LRSA"), stocks fish in the Lehigh River for recreational fishing. Low flows during the summer allegedly kill many of these fish. These flows also have a negative impact on boating in the area and have caused the cancellation of several scheduled releases for white-water rafting. Plaintiffs assert that increasing the water flow during the summer by storing water during the winter and spring would protect and enhance recreation.

Regarding plaintiffs' NEPA and FWCA claims, the Corps issued an Environmental Assessment ("EA") for the Walter Dam in 1975, indicating that the EA was "restricted to the effects of operation and maintenance as specified in the U.S. Army Corps of Engineers Operation and Maintenance Manual published in December 1972 and the Reservoir Regulation Manual, revised September 1963." AR II, 0017. At that time, a Finding of No Significant Impact ("FONSI") was made and therefore, an Environmental Impact Statement ("EIS") was not prepared. AR II, 0024. When preparing the 1975 EA, the Corps consulted with the U.S. Fish & Wildlife Service and the Commonwealth's Department of Environmental Resources. AR II, 0028–29. Plaintiffs claim that the Corps' current water release policy and the storage of water for the DRBC were major federal actions that required the preparation of a supplemental EIS. The Corps contends that these actions were merely part of the regular operation of the dam that did not trigger any obligations under the FWCA or NEPA.

## II. Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A court must determine "whether the evidence presents a sufficient [factual] disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a

matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). At the summary judgment stage, the Court must view the evidence, and draw all reasonable inferences, in the light most favorable to the non-moving party. *See Dici v. Com. of Pa.*, 91 F.3d 542, 547 (3d Cir.1996). This standard is the same for cross-motions for summary judgment. *See Appelmans v. City of Philadelphia*, 826 F.2d 214, 216 (3d Cir.1987). However, when the nonmoving party "bears the burden of persuasion at trial, the moving party may meet its burden on summary judgment by showing that the nonmoving party's evidence is insufficient to carry that burden." *Foulk v. Donjon Marine Co., Inc.*, 144 F.3d 252, 258 n. 5 (3d Cir.1998) (quoting *Wetzel v. Tucker*, 139 F.3d 380, 383 n. 2 (3d Cir. 1998)).

## III. WRDA Claims

Plaintiffs seek review of defendants' alleged violations of the WRDA in connection with the operation of the Francis E. Walter Dam ("Walter Dam") under section 6 of the 1988 WRDA and section 306 of the 1990 WRDA.[4] As neither provision of the WRDA at issue in this case makes explicit provision for judicial review, plaintiffs look to the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.* (1996 & West Supp.2001) as a source of authority for review.

### A. Review under the APA

Judicial review is provided for by § 702 of the APA, which states that, "A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. The APA defines agency action as including the failure to act. 5 U.S.C. § 551(13). District courts may review "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court ..." 5 U.S.C. § 704.

The framework of the APA provides a general presumption of reviewability. *See Abbott Laboratories v. Gardner*, 387 U.S. 136, 140 n. 2, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). However, there is an important limitation upon this general presumption. Section 701(a) of the APA prohibits review in two situations, stating that:

> (a) This chapter applies, according to the provisions thereof, except to the extent that—
>
> (1) statutes preclude judicial review; or
>
> (2) agency action is committed to agency discretion by law.

5 U.S.C. § 701(a). The first exclusion has been interpreted as requiring "clear and convincing evidence" that Congress intended judicial review to be precluded. *See Block v. Community Nutrition Inst.*, 467 U.S. 340, 350–51, 104 S.Ct. 2450, 81 L.Ed.2d 270 (1984). This evidence is present when the requisite congressional intent is "fairly discernible in the statutory scheme." *Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150, 157, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970).

With regard to the second § 701(a) exception, the Supreme Court has ruled that the prohibition on review of agency action committed to agency discretion is a "narrow exception ... [which] is applicable in those rare instances where 'statutes are drawn in such broad terms that in a given

4. Section 306 of the 1990 WRDA was codified as 33 U.S.C. § 2316 and will be referred to under that title for the balance of this opinion. Section 6 of the 1988 WRDA was never included in the United States Code.

case there is no law to apply.' " *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 410, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971) (*quoting* S.Rep. No. 752, 79th Cong., 1st Sess., 26 (1945)). This exception applies where "a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Heckler v. Chaney,* 470 U.S. 821, 830, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985).

While this second exception has generally been characterized as a narrow one, the Supreme Court has indicated that it has broad application in the context of agency inaction. *See Chaney,* 470 U.S. at 831, 105 S.Ct. 1649. The Court highlighted the "general unsuitability for judicial review of agency decisions to refuse enforcement," which it found to create a "presum[tion of] immun[ity] from judicial review under § 701(a)(2)." *Chaney,* 470 U.S. at 831, 832, 105 S.Ct. 1649. In support of this presumption, the *Chaney* Court mentioned several factors that distinguish an agency decision not to enforce from other forms of agency action. First, it noted certain administrative concerns, particularly the "complicated balancing of a number of factors which are peculiarly within [agency] expertise." *Id.* at 831, 105 S.Ct. 1649. Second, it found that "when an agency refuses to act it generally does not exercise its *coercive* power over an individual's liberty or property rights, and thus does not infringe upon areas that courts often are called upon to protect." *Id.* at 832, 105 S.Ct. 1649 (emphasis in original). Third, the Court observed that when an agency decides to take action, there is "a focus for judicial review." *Id.* Finally, the Court found great similarities to the exercise of prosecutorial discretion and a corresponding impropriety of judicial review. *Id.*

The *Chaney* Court did find that the presumption of unreviewability may be rebutted in particular situations. First, "where the substantive statute has provided guidelines for the agency to follow in exercising its enforcement powers." *Chaney,* 470 U.S. at 833, 105 S.Ct. 1649. Second, it noted that an agency's refusal to act solely on the ground that it lacks jurisdiction, or a situation where the agency has " 'consciously and expressly adopted a general policy' that is so extreme as to amount to an abdication of its statutory responsibilities," could also rebut this presumption. *Id.* at 833, n. 4, 105 S.Ct. 1649; *see also, Northern Indiana Public Service Co. v. FERC,* 782 F.2d 730, 745–46 (7th Cir. 1986). Finally, the Court mentioned in passing that the *Chaney* presumption of unreviewability might not apply where a "colorable claim is made ... that the agency's refusal to institute proceedings violated any constitutional rights of [plaintiffs]." *Chaney,* 470 U.S. at 838, 105 S.Ct. 1649.

Subsequent to *Chaney,* the Supreme Court has extended its § 701(a) analysis to find judicial review precluded in a number of other circumstances. *See, e.g., ICC v. Locomotive Engineers,* 482 U.S. 270, 282, 107 S.Ct. 2360, 96 L.Ed.2d 222 (1987) (barring review of an agency's refusal to grant reconsideration of an action because of material error); *Webster v. Doe,* 486 U.S. 592, 599–601, 108 S.Ct. 2047, 100 L.Ed.2d 632 (1988) (cannot review termination of an employee for reasons of national security); *Lincoln v. Vigil,* 508 U.S. 182, 192–93, 113 S.Ct. 2024, 124 L.Ed.2d 101 (1993) (decision concerning funding of programs from a lump-sum allocation is unreviewable). The logic of *Chaney* and its progeny has been closely tracked by the federal appellate courts. *See, e.g., American Disabled for Attendant Programs Today v. United States Department of Housing and Urban Development,* 170 F.3d 381, 385 (3d Cir. 1999); *Sierra Club v. Larson,* 882 F.2d 128, 130–32 (4th Cir.1989); *Massachusetts Public Interest Research Group, Inc. v. U.S. Nuclear Regulatory Com'n,* 852 F.2d 9, 14–15 (1st Cir.1988). Other appellate

courts have recognized limitations on the reach of *Chaney* by focusing upon the statutory scheme and purpose. The Tenth and D.C. Circuits have held that agency refusals to initiate rulemaking are not subject to the *Chaney* presumption. *See Maier v. United States Environmental Protection Agency,* 114 F.3d 1032 (10th Cir.1997); *American Horse Protection Ass'n v. Lyng,* 812 F.2d 1 (D.C.Cir.1987). *See also,* Cass R. Sunstein, *Reviewing Agency Inaction After Heckler v. Chaney,* 52 U.Chi.L.Rev. 653, 680–83 (1985). Several other courts have found the *Chaney* presumption inapplicable because the statute at issue contained specific guidelines that limited agency discretion. *See e.g., Socop–Gonzalez v. I.N.S.,* 208 F.3d 838, 844 (9th Cir. 2000) (finding that regulations promulgated by agency under authority of general statute are sufficient law to apply); *Beno v. Shalala,* 30 F.3d 1057, 1067 (9th Cir. 1994) ("AFDC program contains complex and detailed regulations and does not reveal a congressional commitment to the unfettered discretion of the Secretary"); *National Wildlife Federation v. U.S. E.P.A.,* 980 F.2d 765, 773–74 (D.C.Cir. 1992) ("statute reflects an intent to circumscribe agency enforcement discretion"); *C.K. v. Shalala,* 883 F.Supp. 991, 1003 (D.N.J.1995) ("AFDC program [is] circumscribed by comprehensive regulations with no intimation from Congress that the Secretary's discretion is immune from judicial scrutiny") While two courts have found that a decision not to promulgate general regulations embodying the intent of Congress was distinguishable from the factual situation in *Chaney,* the statutes in these cases also provided specific guidance and required some specific action from the agency. *See Iowa ex rel. Miller v. Block,* 771 F.2d 347, 350–51 (8th Cir.1985) (Section 1981a "requires the development of substantive standards at the agency level to guide the Secretary's discretion in making individual deferral decisions"); *Alliance for Bio-Integrity v. Shalala,* 116 F.Supp.2d 166, 171 (D.D.C., 2000) ("the FDA's formal publication of the Statement of Policy provides a focal point for this Court's review of the agency's action").

■ For claims that survive this threshold § 701(a)(2) jurisdictional inquiry, the standard of review is defined by Section 706 of the APA, which provides in relevant part:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—
>
> (1) compel agency action unlawfully withheld or unreasonably delayed; and
>
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be—
>
> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

5 U.S.C. §§ 706. In most cases, judicial review occurs under the 'arbitrary and capricious' standard of § 706(2)(A). The Third Circuit described the arbitrary and capricious standard of review as follows:

> [A] court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error in judgment. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.

*Society Hill Towers Owners' Assoc. v. Rendell,* 210 F.3d 168, 178 (3d Cir.2000) (internal citations omitted). This is a fairly deferential approach to review of agency action. "An action will not be deemed

arbitrary, capricious, or an abuse of discretion simply because one may happen to think it ill-considered or to represent the less appealing alternative solution available." *Hondros v. United States Civil Service Comm'n,* 720 F.2d 278, 295 (3d Cir.1983) (*quoting Calcutta E. Coast of India & E. Pakistan U.S.A. Conference v. Federal Maritime Comm'n,* 399 F.2d 994, 997 (D.C.Cir.1968)). Plaintiffs' claims under the 1988 WRDA and 1990 WRDA must be analyzed within this legal framework of judicial review.

### B. Reviewability of the Corps' Failure to Implement its Environmental Mission Under APA § 701(a)

Plaintiffs allege that the Corps was under an obligation to implement an environmental protection mission pursuant to § 306 of the 1990 WRDA and that the Corps' failure to do so constitutes agency action "unlawfully withheld" under § 706(1) of the APA. This provision was codified as 33 U.S.C. § 2316 and provides in relevant part:

> **§ 2316. Environmental protection mission**
>
> **(a) General rule**
>
> The Secretary shall include environmental protection as one of the primary missions of the Corps of Engineers in planning, designing, constructing, operating, and maintaining water resources projects.
>
> **(b) Limitations**
>
> Nothing in this section affects—
>
> (1) existing Corps of Engineers' authorities, including its authorities with respect to navigation and flood control.

33 U.S.C. § 2316.

Plaintiffs claim that the Corps has done nothing in response to the enactment of this statutory provision and specifically mention the failure of the Corps to alter the minimum water release policy at the Walter Dam. Defendants respond that this statutory provision does not impose any affirmative obligation on the Corps. Alternatively, if such a duty exists, the Corps claims that the informal interpretation of § 2316 included in the Corps' 1996 Digest of Water Resources Policies and Authorities, EP 1165-2-1 at 19-4, 19-6, which superceded the Digest issued in 1989, was sufficient to fulfill its statutory obligation. Plaintiffs do not challenge the Corps' assertion that such an informal interpretation was included in the Corps' Digest, though they claim that it was only published in the 1999 version of the Digest. Pl. Memo in Support of Motion for Summary Judgment at 22-23.

■ The initial issue raised by plaintiffs' claims is whether the Corps' failure to act in response to 33 U.S.C. § 2316 is reviewable by a court.[5] Essentially, the relevant question is whether either of the two exceptions to the general presumption of reviewability set out in § 701(a) apply in this case. That is, whether "(1) statutes preclude judicial review, or (2) agency action is committed to agency discretion by law." 5 U.S.C. § 701(a). This inquiry must begin with the text of the relevant statute.

■ When interpreting a statute, a court must first look to the plain meaning of the statutory language at issue. *See*

5. Defendants never raised the issue of § 701(a) and the *Chaney* presumption in either their filings regarding their motion to dismiss or their motion for summary judgment. However, as *Chaney* deals with the threshold issue of availability of judicial review, I must raise it sua sponte and deal with it before addressing whether the Corps' actions were arbitrary and capricious.

*Kaiser Aluminum & Chem. Corp. v. Bonjorno,* 494 U.S. 827, 835, 110 S.Ct. 1570, 108 L.Ed.2d 842 (1990); *Proffitt v. EPA,* 930 F.Supp. 1088, 1097 (E.D.Pa.1996). The language of § 2316 indicates that Congress intended the Corps to consider environmental protection as a primary mission in its administration of water resources projects. *See, e.g., United States v. Monsanto,* 491 U.S. 600, 607, 109 S.Ct. 2657, 105 L.Ed.2d 512 (1989); *Proffitt,* 930 F.Supp. at 1097. This statutory directive is framed as a general instruction to the Corps. *See* 33 U.S.C. § 2316. There is no explicit limitation on judicial review contained in this provision, therefore the first § 701(a) exception is inapplicable. *See Block v. Community Nutrition Inst.,* 467 U.S. at 350–51, 104 S.Ct. 2450.

With regard to the second § 701(a) exception, the inquiry is whether the statute provides sufficient guidance to make judicial review possible. *See Chong v. Director, United States Information Agency,* 821 F.2d 171, 176 (3d Cir.1987). Whether a particular statute meets this standard is "statute specific and relates to the language of the statute and whether the general purposes of the statute would be endangered by judicial review." *Esmeralda v. Department of Energy,* 925 F.2d 1216, 1218 (9th Cir.1991). The text of § 2316 provides only a general statement that establishes environmental protection as one of the Corps' primary missions. However, this language gives no guidance on how this mission is to be carried out. Therefore, § 2316 falls under the § 701(a) exception for cases where "agency action is committed to agency discretion by law." This finding is consistent with the rulings of other courts that have analyzed similar statutes under § 701(a).

In *Chaney,* the Court dealt with a challenge to the Food and Drug Administration's failure to apply the Food, Drug and Cosmetics Act with respect to drugs used in administration of the death penalty by lethal injection. The statute at issue included a general enforcement provision by which the "Secretary is authorized to conduct examinations and investigations." *Chaney,* 470 U.S. at 835, 105 S.Ct. 1649, (*quoting* FDCA, 21 U.S.C. § 372). The statute also included provisions for injunctions, 21 U.S.C. § 332 and criminal sanctions, 21 U.S.C. §§ 333, 335. The *Chaney* Court found that this statutory language did not provide sufficiently specific "law to apply."

In the Supreme Court cases subsequent to *Chaney,* the language was consistently more specific than the environmental protection mission statement in § 2316. Yet, the Court found that these statements also did not provide sufficiently specific "law to apply." *See Lincoln,* 508 U.S. at 185, 113 S.Ct. 2024 (Act authorizing Service to "expend such moneys as Congress may ... appropriate for the benefit, care and assistance of the Indians" and specifically for "therapeutic and residential treatment centers" does not constrain agency discretion); *Webster,* 486 U.S. at 600, 108 S.Ct. 2047 (Section 102(c) of the National Security Act permits termination whenever Director shall "deem [it] necessary or advisable" and does not allow for judicial review); *Locomotive Engineers,* 482 U.S. at 277–78, 107 S.Ct. 2360 (Under 49 U.S.C. § 10327(g), the ICC "may, at any time on its own initiative because of material error, new evidence, or substantially changed circumstances" reopen and reconsider its prior opinions, so it is impossible to devise an adequate standard of judicial review).

Instances where lower courts have found "law to apply" have generally involved specific statutory schemes and directives. *See e.g., Beno v. Shalala,* 30 F.3d at 1067 ("AFDC program contains complex and detailed regulations and does not reveal a congressional commitment to the unfet-

tered discretion of the Secretary"); *Iowa ex rel. Miller v. Block,* 771 F.2d at 350–51 (Section 1981a "requires the development of substantive standards at the agency level to guide the Secretary's discretion in making individual deferral decisions"); *Alliance for Bio–Integrity v. Shalala,* 116 F.Supp.2d at 171 ("the FDA's formal publication of the Statement of Policy provides a focal point for this Court's review of the agency's action"); *C.K. v. Shalala,* 883 F.Supp. at 1003 ("AFDC program [is] circumscribed by comprehensive regulations with no intimation from Congress that the Secretary's discretion is immune from judicial scrutiny").

The mission statement of § 2316 is insufficient to provide law to apply in this case. Therefore, the Corps' inaction with regard to § 2316 is precluded from judicial review.[6] This conclusion is supported by two additional considerations. First, plaintiffs' claims in connection with the Walter Dam are effectively identical to the challenges struck down by the *Chaney* Court. Plaintiffs allege that the Corps failed to undertake its statutory mission of environmental protection at the Walter Dam. However, the environmental protection mission was placed upon the Corps as a whole, not upon each individual water resources project. The Corps has the discretion to apply this statutory mission to water resources projects that it operates, but is not obligated to implement it at any particular one. The inaction that plaintiffs challenge in this case is fundamentally the same as a failure to institute an enforcement action. The *Chaney* Court noted several reasons why judicial review should be presumed to be precluded in such a situation. Specifically, the Court mentioned that it is a matter with which an agency, such as the Corps, is "far better equipped to deal than the courts," especially as there are "many variables involved in the proper ordering of [the Corps'] priorities." *Chaney,* 470 U.S. at 831–32, 105 S.Ct. 1649.

Second, to the extent that plaintiffs claim that the Corps as a whole has failed to take any action to implement § 2316, there is evidence of at least a minimal response by the Corps. The parties agree that the 1990 WRDA, later codified as § 2316, is mentioned in two sections on environmental policy in the Corps' Digest.[7] The 1990 WRDA is mentioned in both versions of the Corps' Digest, first in a list of "Authorities Supporting Ecosystem Restoration" in paragraph 19–7, and second in paragraph 19–8(e), which reads:

> e. *Section 306 of WRDA 1990 (Public Law 101–640)* authorizes the Secretary of the Army to include environmental protection (i.e., measures undertaken to protect and preserve elements of an ecosystem's structure and functions against degradation) as one of the primary missions of the Corps. Guidance on this provision of WRDA 1990 has not been specifically developed, as the guidance on ecosystem restoration is believed to

6. Plaintiffs' claims of arbitrary and capricious action by the Corps pursuant to § 2316 are also unreviewable, as § 701(a)(2) precludes any judicial review of § 2316 under the APA.

7. However, the parties disagree as to when the 1990 WRDA was first included in this policy. Plaintiffs claim that this policy was not adopted until July 30, 1999. See Pl. Memo in Support of Motion for Summary Judgment, pg. 22–24. Defendants reply that the 1990 WRDA was first mentioned in a now-superseded 1996 version of the Corps' Digest, which was not available to plaintiffs on the Corps' website. See Defendants' Memorandum in Opposition to Plaintiff's Motion for Summary Judgment, pg. 27 n. 44. The Corps included a copy of this superseded version as an attachment to its Memorandum in Opposition to Plaintiff's Motion for Summary Judgment. The disagreement between the parties is immaterial to the disposition of this issue.

account for the requirements of this provision.

The parties agree that this is the only significant action taken by the Corps in response to the enactment of 33 U.S.C. § 2316 but they disagree as to whether it was a sufficient response.

There is essentially no precedent on an agency's obligation to implement a statutory "mission." Common sense would indicate that the Corps was required to do something in relation to its mission, though probably not as much as would be required to implement a specific "program," *Iowa ex rel. Miller,* 771 F.2d at 350–51, or the "primary purpose" of a specific water resources project, 1988 WRDA § 6. In this case, the Corps specifically included a paragraph about the consequences of § 2316 on Corps' policy. The paragraph also referred to pre-existing ecosystem regulations that the Corps interpreted as satisfying its statutory obligation of environmental protection. While the Corps' publication of two statements in the Corps' Digest is not a comprehensive response to the enactment of § 2316, it appears to be enough to satisfy the minimum action required of the agency under the APA.

### C. Arbitrary and Capricious Implementation of the Corps' Recreation Purpose Under APA § 706(2)

■ Plaintiffs challenge the Corps' implementation of recreational activity in and around the Walter Dam in response to the 1988 WRDA. Section 6 of the 1988 WRDA provides, in relevant part, that:

> (a) [t]he Secretary shall ensure ... that each water resources project referred to in this subsection is operated in such manner as will protect and enhance recreation associated with such project ... [n]othing in this subsection shall be construed to affect the authority or discretion of the Secretary with respect to carrying out other authorized project purposes ... The provisions of this subsection apply to the following projects:
>
> (4) Francis E. Walter Dam, Pennsylvania
>
> (b) ... recreation includes (but shall not be limited to) downstream whitewater recreation which is dependant on project operations, recreational fishing, and boating on the water at the project.

Water Resources Development Act of 1988, Pub.L. 100–676, 102 Stat. 4012.

Unlike the environmental protection statute enacted in the 1990 WRDA, Section 6 of the 1988 WRDA provides guidelines for Corps activity and applies specifically to the Walter Dam. The statute focuses upon particular actions that need to be taken at certain named water resources projects. The specific terms of Section 6 provide the court with "law to apply" in reviewing the Corps' action and inaction. Therefore, this section probably overcomes the *Chaney* presumption and judicial review of the Corps' actions under this statute is available. Under APA § 706(2)(A), the actions will be upheld unless they are proven to be "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Therefore, the Corps' decisions about recreation at the Walter Dam must be subject to a careful and searching inquiry to ensure that they were based upon a consideration of the relevant factors and that no clear error in judgment was made. *See Society Hill Towers Owners' Assoc.,* 210 F.3d at 178.

■ Plaintiffs claim that the Corps' efforts to protect and enhance recreation at the Walter Dam have been minimal. For many years, the Corps has provided picnic areas and boat launches in and around the reservoir conservation pool. The Corps schedules the type of water release required for white-water rafting five times annually, during the summer and fall;

however, these releases are frequently cancelled. The current reservoir recreation was instituted prior to the 1988 WRDA and has continued unchanged since its enactment. Therefore, plaintiffs claim that the Corps has failed to respond to the passage of the 1988 WRDA. Also, plaintiffs attack the Corps' minimum water release policy, which they claim causes great harm to spawning fish and thus to recreational fishing on the Lehigh River.

The Corps responds by pointing to the recreation plan included in the 1994 Water Control Manual and the specific provisions for high volume water releases for white water rafting. The Corps also cites its broad managerial discretion over the operation of the Walter Dam. Its defense is that "the Corps, utilizing its discretionary authority to manage the Walter Dam, has struck a balance in the WD Manual between the different recreational uses, and between the recreational uses and other purposes of the dam ..." Defs. Opposition to Plfs. Motion for Summary Judgment at 36. The Corps contends that this balance is not arbitrary, capricious or an abuse of discretion and that, at best, plaintiffs could demonstrate that these decisions were "ill-considered, or ... the less appealing alternative solution available," which is not a ground for judicial relief. *Hondros,* 720 F.2d at 295.

In applying the arbitrary and capricious standard, the task of the reviewing court is to determine "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *C.K. v. New Jersey Dep't of Health and Human Services,* 92 F.3d 171, 182 (3rd Cir.1996) (*quoting Overton Park,* 401 U.S. at 416, 91 S.Ct. 814). Plaintiffs claim that the Corps failed to take certain relevant factors into account in making its decision not to amend the minimum water release policy. Specifically, they mention studies by the U.S. Fish & Wildlife Service and the Pennsylvania Fish & Boat Commission, as well as a letter by Congressman Paul E. Kanjorski. However, while several of the studies recommended an increase in minimum water flows, they were conducted in connection with a proposed modification of the Walter Dam, under which it would be transformed from a single-use to a multiple purpose dam. In addition, some of the recommendations, while finding benefits from increased water flow, were equivocal as to the extent of these benefits. *See* Letter from Pennsylvania Fish & Boat Commission, AR XIV 0023–24. The administrative record indicates that the Corps reviewed and considered these documents in making its decision. *See* Final EIS for Modification of the Walter Dam, AR IIIA EIS–2. Additionally, the Corps has made some provision for recreation at the Walter Dam, both in the conservation pool and downstream from the dam. Accordingly, the Corps' decisions with regard to recreation at the Walter Dam are neither arbitrary nor capricious.

## IV. FWCA Claim

Plaintiffs claim that the Corps violated its duty under the Fish and Wildlife Coordination Act, 16 U.S.C. § 661 *et seq,* by failing to heed the requests of the U.S. Fish & Wildlife Service ("FWS") to raise minimum releases from the F.E. Walter Dam. The FWCA requires that, prior to the commencement of any project that would cause the:

> waters of any stream or other body of water ... to be impounded, diverted, the channel deepened, or the stream or other body of water otherwise controlled or modified for any purpose whatever, including navigation and drainage, by any department or agency of the United States, or by any public or private agency under Federal permit or license, such department or agency first shall consult

with the United States Fish and Wildlife Service, Department of the Interior....

16 U.S.C. § 662(a). Agencies that engage in such consultation must give full consideration to the reports and recommendations of the FWS in making their decisions, though they are not bound to follow them. *See* id. § 662(b); *Texas Committee on Natural Resources v. Marsh,* 736 F.2d 262, 267 (5th Cir.1984) (*quoting Zabel v. Tabb,* 430 F.2d 199, 213 (5th Cir.1970)).

The FWCA does not contain a citizen suit provision, so there is no private right of action directly given to plaintiffs in the statute. However, several courts have held that the National Environmental Policy Act ("NEPA") incorporates the FWCA and that an agency in compliance with NEPA has necessarily also complied with the FWCA. *See Texas Committee on Natural Resources,* 736 F.2d at 268; *Environmental Defense Fund, Inc. v. Froehlke,* 473 F.2d 346, 356 (8th Cir.1972); *Sierra Club v. U.S. Army Corps of Engineers,* 935 F.Supp. 1556, 1579 (S.D.Ala.1996); *Bergen County v. Dole,* 620 F.Supp. 1009, 1064 (D.N.J.1985). As a private right of action exists under NEPA, plaintiffs may assert their FWCA claims through that mechanism. *See Sierra Club,* 935 F.Supp. at 1579. Therefore, I will consider these claims together under NEPA.

## V. NEPA Claim

Plaintiffs claim that the Corps violated the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.,* by failing to file an Environmental Impact Statement ("EIS") in connection with its minimum release policy and storage of water for the Delaware River Basin Commission ("DRBC"). NEPA is "primarily a procedural statute ... designed to ensure that environmental concerns are integrated into the very process of agency decisionmaking." *Morris County Trust for Historic Preservation v. Pierce,* 714 F.2d 271, 274 (3d Cir.1983) (internal citations omitted).

NEPA requires that whenever a federal agency proposes an action, it must first prepare an environmental assessment ("EA") in making a threshold determination of whether to issue an EIS or a finding of no significant impact ("FONSI"). *See Society Hill Towers Owners' Assoc.,* 210 F.3d at 173–74. The agency must prepare an EIS if the EA concludes that the proposed action is a "major federal action significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). If the agency finds that the proposed action will not have a significant impact, then it must file a FONSI, providing brief reasons why the action will not significantly affect the quality of the human environment. *See* 40 C.F.R. § 1501.4(e); § 1508.13; *Department of Envtl. Protection & Energy v. Long Island Power Auth.,* 30 F.3d 403, 409–10 (3d Cir. 1994).

NEPA became effective on January 1, 1970 and does not apply retroactively to the construction of projects completed before that date, *see Pennsylvania Environmental Council v. Bartlett,* 454 F.2d 613, 624 (3d Cir.1971), and federal actions that merely maintain the status quo do not trigger NEPA's requirements. *See Fund for Animals, Inc. v. Thomas,* 127 F.3d 80, 84 (D.C.Cir.1997). In addition, the routine maintenance of an ongoing, pre-NEPA project does not trigger NEPA's requirements. *See Upper Snake River of Trout Unlimited v. Hodel,* 921 F.2d 232, 234 (9th Cir.1990); *County of Trinity v. Andrus,* 438 F.Supp. 1368, 1389 (E.D.Cal.1977). Indeed, certain actions at projects run by the Corps, including routine operation and maintenance actions, are specifically excluded from the requirements of NEPA. *See* 33 C.F.R. § 230.9(b) (West Supp.2001). However, "the mere fact that the project was initiated prior to January 1, 1970, will not insulate all future

action pursuant to that project from the requirements of NEPA." *County of Trinity,* 438 F.Supp. at 1388. The requirements of NEPA are triggered if, after NEPA's effective date, an agency takes major federal action regarding a fully operational pre-NEPA project. *See Port of Astoria v. Hodel,* 595 F.2d 467, 479 (9th Cir.1979). Effectively, then, any "major federal action" that the agency takes is subject to the requirements of NEPA. *See Andrus v. Sierra Club,* 442 U.S. 347, 363 n. 21, 99 S.Ct. 2335, 60 L.Ed.2d 943 (1979). An aggrieved party may bring a claim of non-compliance with NEPA under the APA's provision for judicial review. *See Central South Dakota Co-op. Grazing Dist. v. Secretary of U.S. Dept. of Agriculture* 266 F.3d 889, 894 (8th Cir.2001) ("Although NEPA does not authorize a private right of action, the Administrative Procedure Act (APA) provides for judicial review of agency action"); *Society Hill Towers Owners' Ass'n* 210 F.3d at 178 (reviewing failure to comply with NEPA under the APA).

The determination of whether an agency action constitutes a major federal action "depend[s] heavily upon the unique factual circumstances of each case." *Westside Property Owners v. Schlesinger,* 597 F.2d 1214, 1224 (9th Cir.1979). In this context, courts have looked at "whether the proposed agency action and its environmental effects were within the contemplation of the original project when adopted or approved." *Westlands Water District v. United States,* 850 F.Supp. 1388, 1415 (E.D.Cal.1994) (listing cases).

If the Corps is found to have taken any "major federal action significantly affecting the quality of the human environment," the next step in the analysis is to determine whether the Corps violated any NEPA obligations triggered by that action. 42 U.S.C. § 4332(2)(C). Plaintiffs' major claim is that the Corps unlawfully failed to file an EIS for both the water release policy and the storage of water for the DRBC. There is normally extremely deferential review of agency decisions in connection with the filing of an EA or EIS, under the 'arbitrary and capricious' standard. *See Concord Township, et al. v. United States et al.,* 625 F.2d 1068, 1073 (3d Cir.1980) (*citing Overton Park,* 401 U.S. 402, 91 S.Ct. 814). However, the Third Circuit has indicated that greater scrutiny may be appropriate when reviewing an agency's decision to omit the preparation and consideration of an EIS. *See Concord Township,* 625 F.2d at 1073; *Department of Envtl. Protection & Energy v. Long Island Power Auth.,* 30 F.3d 403, 415 n. 21 (3d Cir.1994). In *Concord Township,* the Third Circuit noted a "dispute among reviewing courts" as to whether "the decision not to prepare an impact statement should be measured by its reasonableness in the circumstances," or whether the traditional abuse of discretion standard should apply. 625 F.2d at 1073 (mentioning the Fifth, Ninth and Tenth Circuits as proponents of the reasonableness standard and the Second and Seventh Circuits as following the abuse of discretion standard). The Third Circuit has yet to decide which of the two standards is appropriate to apply.[8]

8. In all cases before the Third Circuit, the court found either that the more stringent reasonableness standard had been met, *see Concord Township,* 625 F.2d at 1074; *Long Island Power Auth.,* 30 F.3d at 415 n. 21; *Township of Springfield v. Lewis,* 702 F.2d 426, 436–37 (3d Cir.1983), or that agency's decision did not pass muster even under the arbitrary and capricious standard. *See Morris County Trust for Historic Preservation v. Pierce,* 714 F.2d 271, 278 n. 5 (3rd Cir.1983). However, it has noted that the district courts in the Third Circuit have tended to apply the reasonableness standard to decisions not to file an EIS. *See Concord Township,* 625 F.2d at 1074.

Plaintiffs challenge both the Corps' water release policy at the Walter Dam and its storage of water for the DRBC in the dam's conservation pool. Both claims raise different issues under NEPA, so I will discuss them separately.

### A. Water Release Policy

Plaintiffs challenge the current release policy at the Walter Dam, as set forth in the WD Manual of 1994, as being a "major federal action" that necessitated the filing of an EIS. They claim that the current release policy was not contemplated at the time that the Dam was built. While they do not attempt to challenge each individual release of water as a "major federal action," plaintiffs claim that the Corps has recently adopted a new attitude toward the release of water from the Dam, embodied in the WD Manual of 1994, that does constitute such a "major federal action." In support of this claim, plaintiffs point out that the 1994 WD Manual is the first revision of the Manual since the Dam began operations.

The minimum water release policy is specifically directed at the outflow from the dam on any given day. The Corps claims that this is part of the "routine operation and maintenance" of the dam. 33 C.F.R. § 230.9(b). Several courts have examined whether alteration in outflow from a dam constitutes a major federal action under NEPA. In *Upper Snake River*, the Ninth Circuit found that, in reducing outflow to less than 1000 cfs, the federal defendants were "simply operating the facility in the manner intended. In short, they are doing nothing new, nor more extensive, nor other than that contemplated when the project was first operational." 921 F.2d at 235. Similarly, in *County of Trinity*, the court found that the Bureau of Reclamation was not required to prepare an EIS when it reduced the level of water released into the Trinity River during a drought. 438 F.Supp. at 1368–69.

The Ninth Circuit's approach in *Upper Snake River* is persuasive in its analysis of water flow as being part of the regular operations of a dam. Indeed, where the primary purpose of a dam is flood control, nothing could be more centrally located within the operational control of the agency maintaining it than the regulation of water flow into and out of the dam. As such, the Corps' decisions and policies with regard to minimum water releases from the Walter Dam are part of its ordinary operation of the dam and do not effect a change in the status quo. Therefore, as a matter of law, the water releases from the Walter Dam and the Corps' policy regarding those releases are not major federal actions, and the Corps had no duty to prepare an EIS in connection with these releases.

### B. Water Storage for the DRBC

Plaintiffs also challenge the Corps' storage of water in the dam's conservation pool for the DRBC, both during 1999 and with regard to current negotiations for future storage as major federal actions triggering NEPA. During August and September of 1999, the Corps raised the level of the Walter Dam's conservation pool to 1392 ft. at the request of the DRBC. Plaintiffs characterize this action as a "major federal action" that required the filing of an EIS under NEPA. Plaintiffs also allege that the Corps is currently engaged in negotiations with the DRBC for similar water storage in the future. Plaintiffs ask that the court enjoin any contract that results from these negotiations, unless it provides for environmental protection.

Defendants claim that the water storage for the DRBC during the summer of 1999 is moot. Because this involves an issue of Article III standing, it is a threshold issue and must be addressed

prior to dealing with plaintiffs' substantive claims. *See Chong v. District Director, I.N.S.*, 264 F.3d 378, 383 (3d Cir.2001). The mootness determination depends upon whether, because no such storage is currently occurring, "a real and substantial controversy admitting of specific relief through a decree of conclusive character" remains. *New Rock Asset Partners, L.P. v. Preferred Entity Advancements, Inc.*, 101 F.3d 1492, 1496 (3d Cir.1996).

In this case, plaintiffs are challenging the storage of water by the Corps during a short period of time in 1999. They do not allege that this storage is currently continuing, nor that any specific effects of the storage are still manifest today. However, the only relief being sought by plaintiffs is prospective injunctive relief against further storage.[9] The grant of such a remedy will not provide plaintiffs with any relief from the violations that they are challenging. Thus, the relief available to plaintiffs in this case will not provide "specific relief" to a "real and substantial controversy" before the court. *New Rock Asset Partners*, 101 F.3d at 1496. Plaintiffs' claims based upon these past instances of water storage are therefore moot.

Plaintiffs raise one exception to the mootness doctrine, dealing with questions that are "capable of repetition, yet evading review." *See Dunn v. Blumstein*, 405 U.S. 330, 333 n. 2, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972); *State of New Jersey, Department of Environmental Protection and Energy v. Heldor Industries, Inc.*, 989 F.2d 702 (3d Cir.1993) (*quoting Southern Pacific Terminal Co. v. Interstate Commerce Comm'n*, 219 U.S. 498, 515, 31 S.Ct. 279, 55 L.Ed. 310 (1911)). The Supreme Court has indicated that this exception only applies where two factors are simultaneously present: "(1) the challenged action [is] in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same complaining party would be subjected to the same action again." *Lewis v. Continental Bank Corp.*, 494 U.S. 472, 481, 110 S.Ct. 1249, 108 L.Ed.2d 400 (1990) (*quoting Weinstein v. Bradford*, 423 U.S. 147, 149, 96 S.Ct. 347, 46 L.Ed.2d 350 (1975)).

Plaintiffs cite facts that they claim are relevant to the exception for cases that are "capable of repetition, yet evading review." They allege that the Corps is engaging in negotiations for future water storage with the DRBC. In addition, it is undisputed that the Corps has stored water in the Walter Dam's conservation pool for the DRBC on several occasions during the past forty years. While these allegations might be sufficient to demonstrate a "reasonable expectation" of repetition, they fail to convince me that the storage is of such short duration as to prevent litigation challenging it. Plaintiffs focus upon the Corps' storage of water during two months of 1999. The time period at issue is arguably short enough to preclude litigation of the lawsuit prior to its cessation or expiration. However, two facts specific to this lawsuit convince me that the "capable of repetition, yet evading review" exception is not applicable in this case.

First, plaintiffs chose to challenge the 1999 water storage in a wide-ranging lawsuit against the Corps. The lawsuit alleges violations of several federal statutes, as well as the Pennsylvania Constitution. However, this was not plaintiffs' only available means of challenging the storage of water for the DRBC. Plaintiffs were free to make use of such judicial processes as preliminary injunctions, emergency stays

9. Plaintiffs cannot seek money damages in this case, as they have obtained judicial review through the mechanism of the APA, which only waives sovereign immunity for equitable and injunctive relief. *See* § 702.

and temporary restraining orders to protect against any similar storage of water in the future. *See Missouri ex rel. Nixon v. Craig,* 163 F.3d 482, 485 (8th Cir.1998); *South Dakota v. Hazen,* 914 F.2d 147, 150 (8th Cir.1990). Such judicial mechanisms permit litigation to proceed at an accelerated pace and could be utilized in a time period of two months. Second, while the water storage in 1999 lasted for only two months, it is one of several similar occasions of water storage at the Walter Dam during the past forty years. Of the four similar instances of water storage for the DRBC that preceded 1999, two lasted for three to four months, one lasted for eight months and the fourth continued for eighteen months.[10] Given the historical duration of such water storage, this challenge to the 1999 storage is not a particularly compelling situation for application of the "capable of repetition, yet evading review" exception. The plaintiffs have not satisfied the requirements of this exception; therefore, their claim with regard to the 1999 storage of water for the DRBC is moot.

Plaintiffs also challenge the alleged negotiations between the Corps and the DRBC concerning future storage of water and request that I enjoin any storage that does not adequately provide for environmental protection. As a threshold issue, plaintiffs must meet the requirements of Article III constitutional standing for a court to have jurisdiction over their claims. The Third Circuit has recently summarized these requirements as follows:

> (1) the plaintiff must have suffered an injury in fact-an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) there must be a causal connection between the injury and the conduct complained of-the injury has to be fairly traceable to the challenged action of the defendant and not the result of the independent action of some third party not before the court; and (3) it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Society Hill Towers Owners' Assoc.,* 210 F.3d at 175–76 (*quoting Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts Inc.,* 140 F.3d 478, 484–85 (3d Cir.1998)).

Keeping in mind that, in response to a summary judgment motion, plaintiffs "can no longer rest on such 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts,' Fed.Rule Civ.Proc. 56(e), which for purposes of the summary judgment motion will be taken to be true," *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992), I turn to the evidence plaintiffs have provided. With respect to the alleged negotiations between the Corps and the DRBC, there is simply no evidence in the administrative record or plaintiffs' standing affidavits to demonstrate that plaintiffs have suffered an injury to any cognizable legal interest. Plaintiffs can claim no current injury from the alleged negotiations, mentioning only the negative effects that storage of water has had in the past. However, the Supreme Court has noted that "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief ... if unaccompanied by any continuing, present adverse effects." *Lujan v. Defenders of Wildlife,* 504 U.S. at 564, 112 S.Ct. 2130. Thus, evidence of past water storage by the Corps on behalf of the DRBC is insufficient to support standing on this claim. As plaintiffs have provided no specific facts relating to any current injury they have sustained from these ne-

10. See Defs. Opposition to Plntfs. Motion for Summary Judgment, p. 35 n. 60.

gotiations, they have no standing to challenge them.

Summary judgment will be granted to defendants on both the NEPA and FWCA claims. Thus, a review any of these claims under either the 'reasonableness' standard or the 'arbitrary and capricious' standard of APA § 706(2) is unnecessary.

## VI. Claim Under the Pennsylvania Constitution

■ Plaintiffs claim that the Corps' current water release policy violates Art. I § 27 of the Pennsylvania Constitution by releasing too much water in the spring and failing to store and release water in a manner that provides for increased daily flow during the summer. Art. I § 27, in pertinent part, states:

> The people have a right to clear air, pure water, and to the natural, scenic, historic and esthetic values of the environment. Pennsylvania's public natural resources are common property of all the people, including generations yet to come. As trustee of these resources, the Commonwealth shall conserve and maintain them for the benefit of all the people.

Pa. Const. art. I § 27.

■ Defendants respond that the Corps' sovereign immunity prevents any suit being brought against the Corps under the Pennsylvania Constitution. They claim that the Corps has not waived sovereign immunity with regard to this claim, and that this court has no power to entertain claims for alleged violations of the Pennsylvania Constitution in this situation. "Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit." *FDIC v. Meyer*, 510 U.S. 471, 475, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994). *See also Antol v. Perry*, 82 F.3d 1291, 1296 (3d Cir.1996). The Supreme Court has clearly stated that an "unequivocal expression" of the waiver of sovereign immunity must be in the text of the relevant statute for a claim to go forward. *United States v. Nordic Village, Inc.*, 503 U.S. 30, 37, 112 S.Ct. 1011, 117 L.Ed.2d 181 (1992). Plaintiffs have provided no evidence of such a waiver in this case and have presented no other persuasive reason why sovereign immunity should not apply to their state constitutional claim.[11] Therefore, I grant summary judgment to the Corps on this claim.

■

---

**11.** Plaintiffs claim that 33 U.S.C. § 2316 should be read to include this provision of the Pennsylvania Constitution, thus bringing it within the scope of the APA's waiver of sovereign immunity. *See* 5 U.S.C. § 702. However, I have rejected the proposition that § 2316 incorporates any state or federal laws earlier in this opinion. Plaintiffs also request that I exercise supplemental jurisdiction over this state constitutional claim pursuant to 28 U.S.C. § 1367. However, claims heard under the district court's discretionary supplemental jurisdiction are still subject to the requirements of sovereign immunity. *See Pennhurst* State School & Hospital v. Halderman, 465 U.S. 89, 121, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984) ( "[N]either pendent jurisdiction nor any other basis of jurisdiction may override the Eleventh Amendment"); *Wilkerson v. United States*, 67 F.3d 112, 119 n. 13 (5th Cir.1995) ("Section 1367(a), however, deals only with the federal courts' power to exercise subject matter jurisdiction over certain claims and does not operate as a waiver of the United States sovereign immunity"). As there has been no waiver of sovereign immunity here, plaintiffs' state constitutional claim may not be brought against the Corps in this court.